UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION - BAY CITY

IN RE:

COMMUNITY MEMORIAL HOSPITAL,   Case No. 12-20666-dob
                               Chapter 11 Proceeding
         Debtor.               Hon. Daniel S. Opperman
_____/

Opinion Regarding Debtor's Objection to the Allowance of Claim Nos. 133 and 134
Filed by the Michigan Department of Licensing and Regulatory Affairs,
<u>Unemployment Insurance Agency Seeking Administrative Expense Priority Tax Claims</u>

Introduction

The Michigan Unemployment Insurance Agency ("MUIA") filed two Proofs of Claim in this case for reimbursement of monies paid by the MUIA to former employees of the Debtor. The Debtor does not object to the amount of these claims, but objects to the priority status and administrative claim status of each. The Court conducted a preliminary hearing on the objections of the Debtor on January 31, 2013, and conducted an evidentiary hearing on March 1, 2013. At the March 1, 2013, hearing, the Court heard testimony from Neil Zechman, Chief of the MUIA's Administrative Law and Rules Division, as well as Curtis Truitt, Departmental Specialist of the MUIA. The Court also received into evidence Exhibits 1 - 17 per the agreement of the parties.

The Court makes the following findings of fact based upon the testimony of these individuals and the admitted exhibits.

General Facts Regarding Michigan Unemployment Benefits

Individuals have received unemployment benefits for decades in the United States through a system created by the federal government and administered by various state governments. Generally, the federal government creates the framework and guidelines for eligibility for receipt

1

of unemployment benefits, as well as the amount of benefits that can be received. The states are given the task of collecting the unemployment insurance premiums or reimbursements from various employers, distributing money to beneficiaries, and enforcing the unemployment benefits system. The federal government sets these guidelines and gives a credit to individual employers if the individual state statutes conform with the federal statutes and regulations. Presently, the federal unemployment tax rate is 6%, but in those states in which state statutes conform with the federal statutes and guidelines, the amount paid by employers in that state is 6% on a significantly reduced wage amount. The federal unemployment tax is collected and used to fund a number of related expenditures, including (1) all federal and state administrative costs, (2) the federal share of benefits paid under the Federal-State Extended Unemployment Compensation Act of 1970, (3) the loan fund from which an individual state may borrow whenever it lacks funds to pay unemployment compensation due for any month, and (4) benefits under some of the federal supplemental and emergency programs. FUTA tax is also used to fund labor exchange services, employment and training services for veterans and disabled veterans, and some labor market information program activities.

State statutes must conform to the federal statutes and regulations in order to enjoy the reduced federal tax for employers located in that state and to receive reimbursement from the federal government for the costs of administering the unemployment system in that state. In the event a state statute does not conform, the federal government sends a "gauntlet" letter to the affected state and then conduct a conformity hearing if the state statute is not changed. Additionally, the administration of the unemployment system must be in compliance with the federal statutes and regulations or the state will not receive funding for the administration of the unemployment system.

In 1972, Congress made certain changes to the unemployment system, and the United States Department of Labor notified the affected states of those changes in various unemployment

insurance program letters. Of particular interest is unemployment insurance program letter 1212 dated November 14, 1972, that allowed non-profit organizations to elect to make reimbursement payments in lieu of contributions. This letter also allowed state unemployment agencies to require that the affected non-profit organization file a surety bond or other security.

In particular, qualified non-profit organizations were allowed to defer making quarterly contributions based upon the number of employees and the experience rate of each non-profit organization and instead reimburse the state if an unemployment claim was made by and paid to a former employee. This allows the non-profit organization to not pay any money to the state unemployment agency unless and until one of its employees qualified for unemployment benefits. Once an unemployment benefit was paid, the state then bills the affected non-profit organization on a quarterly basis and that bill is paid by the non-profit organization. In contrast with other employers, the non-profit organization pays the actual benefit to its affected ex-employee in the form of reimbursement to the state and does not pay for any costs of administering the unemployment program in any state.

As for the affected Michigan unemployed ex-employee, that individual applies for unemployment benefits and the MUIA reviews the application to see if the applicant qualifies under both monetary and non-monetary considerations. The monetary considerations involve a review of that individual's employment record over five quarters to determine whether that individual qualifies for unemployment benefits and to determine the amount of the unemployment benefits. The non-monetary considerations include a review of the reason that the individual is unemployed such that the individual is not qualified to receive benefits, as well as whether the individual has shown an attachment to the workforce which requires a physical ability to work, a registration in certain work programs, and the reporting of earnings to the MUIA that may reduce or eliminate the unemployment benefits. Applicants who are refused unemployment benefits have certain appeal

3

rights including a right for a redetermination hearing, an administrative law hearing, and then ultimately resort to the state court system.

History of Debtor's Unemployment Insurance Agency Experiences

The Debtor is a not-for-profit organization and qualified for the reimbursement privileges created in 1972. To that end, the Debtor appointed the Michigan Hospital Association Unemployment Compensation Fund as its agent in all proceedings before the Michigan Employment Security Commission, a predecessor to the MUIA. Initially, the Debtor was a member of a group plan which allowed organizations of like characteristics to collect their resources in one fund and then reimburse the State of Michigan as needed. By 1987, this group plan discontinued and the Debtor, through a series of Notices of Determination of Employer Status issued by the Michigan Employment Security Commission became a qualified employer, but was allowed to have the privilege to pay the unemployment insurance benefits on a reimbursed versus a contributed basis. The Michigan Hospital Association, however, remained the agent for the Debtor throughout this time.

In 1989, the State of Michigan received a report which indicated that changes needed to be made to the unemployment system as related to not-for-profit organizations. In that year, the State of Michigan required additional methods of safeguards other than the mere posting of a security bond. Also, as inferred from the testimony on March 1, 2013, a mechanism was put in place to allow the MUIA the ability to enforce payment of reimbursements by the not-for-profit organization. In particular, the MUIA was given direction to proceed as follows: (1) send a billing statement to the not-for-profit organization for the unpaid reimbursement amount; (2) if payment is not received within 5 days of the due date indicated on the billing statement, send a Notice of Assessment; (3) if payment is not received within 5 days of the due date indicated on the Notice of Assessment, send a Notice of Final Demand for Payment; (4) if payment is not received within 10 days of the due date

indicated in the Notice of Final Demand, send a Notice to Withhold and Disclosure to the bank; (5) if the Notice to Withhold and Disclosure have not generated payment within 20 days, send a Lien Warning Letter (now referred to as a Lien Collection Notice); (6) if payment is not received within 10 days of the date of the Lien Warning Letter/Lien Collection Notice, the lien will be generated.

If a not-for-profit organization failed to reimburse the MUIA for two consecutive quarters, then the MUIA is to require additional safeguards such as the posting of a bond, letter of credit, or other instrument to ensure payment. The MUIA is also directed to change the status of the not-for-profit organization from reimbursed to contribute. The change in the status cannot occur, however, until the start of the next calendar year.

<u>Recent History of Debtor's Unemployment Insurance Benefits</u>

The evidence before the Court is that the Debtor, for the most part, paid the billings for the reimbursements in a timely fashion until the end of 2011. By that time, the Debtor was experiencing financial distress and was unable to make payments to the MUIA. As evidenced by Exhibit 8, the Debtor owed $136,162.50 for the period ending March 31, 2012. Before the MUIA could take any further action to collect any unpaid reimbursed amounts, however, the Debtor filed a petition seeking relief under Chapter 11 of the Bankruptcy Code on March 1, 2012. This action stayed any further action by the MUIA to collect the amounts owed to it.

After the filing of its bankruptcy petition, the Debtor continued operations until approximately April 1, 2012, when it needed to discontinue operations. Shortly thereafter, a substantial amount of the assets of the Debtor were sold. Correspondingly, many of the employees of the Debtor were employed by the purchaser, but many employees were not. As a result, these unemployed ex-employees applied for unemployment benefits which the MUIA paid in those instances where the ex-employees were eligible for the benefits. In turn, the MUIA seeks reimbursement of those amounts, and only those amounts, plus interest.

5

12-20666-dob    Doc 681    Filed 05/21/13    Entered 05/21/13 12:44:54    Page 5 of 19

## Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1334, and E.D. Mich. LR 83.50. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims against the estate). The issues in this case arise from Title 11 of the United States Code and do not involve any matter which limits this Court's jurisdiction as detailed by the United States Supreme Court in *Stern v. Marshall*, 131 S. Ct. 2594 (2011) and by the Sixth Circuit Court of Appeals in *Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012).

## Parties' Positions

The MUIA claims a Section 507(a)(8) priority because the reimbursement claims are an excise transaction and, therefore, constitute an excise tax. MUIA argues that the reimbursement is an exaction that is an involuntary burden, imposed by the legislature, for a public purpose, under the police or taxing power of the state. These elements were articulated by the Sixth Circuit Court of Appeals in *Yoder v. Ohio Bureau of Workers' Compensation (In re Suburban Motor Freight, Inc.)*, 998 F.2d 338 (6th Cir. 1993) ("*Suburban I*"). Further, as stated in *Yoder v. Ohio Bureau of Workers' Compensation (In re Suburban Motor Freight, Inc.)*, 36 F.3d 484 (6th Cir. 1994) ("*Suburban II*"), the MUIA posits that these reimbursement amounts are a pecuniary obligation universally applicable to similarly situated entities and the according of priority treatment to the government claim does not disadvantage private creditors with like claims.

The Debtor objects to the priority status claimed by the MUIA and relies on a series of Sixth Circuit Court of Appeals cases, lower court decisions, and decisions from other circuits which deny the priority status claimed by the MUIA.

## Authorities

The Court does not write on a blank slate on this issue, but the slate is not a complete analysis of the issues before the Court.

6

## Sixth Circuit Court of Appeals Cases

*Suburban I* and *Suburban II* are the most recent cases addressing the priority claimed by the MUIA. In *Suburban I*, the Ohio Bureau of Workers' Compensation sought priority status for unpaid premiums. *Suburban I* cited the four elements articulated in *County Sanitation District No. 2, Los Angeles Co. v. Lorber Indus. of California, Inc. (In re Lorber Indus. of California, Inc.)*, 675 F.2d 1062 (9th Cir. 1982), which are the same four elements cited by the MUIA. *Suburban I*, however, expressed the concern that the application of *Lorber*, without more, would result in an automatic priority whenever a government unit files a claim. *Suburban I*, 998 F.2d at 341. Instead, *Suburban I* elected to narrow the "public purpose" element and then analyzed the Ohio Workers' Compensation system. After noting the system was monopolistic and mandatory, administrated exclusively by the state, with no private insurance except for self insurance, and included all Ohio workers with compulsory payment of premiums, the *Suburban I* court held the claim for unpaid Workers' Compensation premiums to be tax. As stated in *Suburban I*:

> Where a State "compel[s] the payment" of "involuntary exactions, regardless of name," and where such payment is universally applicable to similarly situated persons or firms, these payments are taxes for bankruptcy purposes.

*Suburban I*, 998 F.2d at 342 (citing *New Neighborhoods v. West Virginia Workers' Compensation Fund*, 886 F.2d 714 (4th Cir. 1989)).

*Suburban I* did note a possible exception:

> If the State had an optional participation program, or allowed employers to purchase private liability insurance, it would be unfair and without statutory justification to call state collected premiums "taxes" and put the Bureau ahead in line while leaving unpaid private insurers to languish along with the rest of the unsecured creditors.

*Suburban I*, 998 F.2d at 342.

*Suburban II* addressed the priority claim of the Ohio Bureau of Workers' Compensation for reimbursement to the Bureau for payment of workers' compensation claimants because the Debtor failed to pay premiums or failed to pay claims arising when it was self insured. *Suburban II*

followed the *Suburban I* test, and articulated two additional elements:

1. that the pecuniary obligates be universally applicable to similarly situated entities and
2. that according priority treatment to the governmental claim not disadvantaged private creditors with like claims.

*Suburban II*, 36 F.3d at 488.

Applying these elements to the facts, *Suburban II* rejected the priority status because the debtors' liability arose solely by virtue of its default and was, therefore, not a liability universally applicable to similarly situated persons or firms. Moreover, sureties paid $1.7 million to the Bureau, reducing its claim to approximately $800,000. These sureties were private insurers who issued the bonds in order for the debtor to be self insured. The *Suburban II* court noted that allowing priority status to the Bureau would leave "unpaid private insurers to languish along with the rest of the unsecured creditors', a result which would be 'unfair and without statutory justification." *Suburban II*, 36 F.3d at 489 (quoting *Suburban I*, 998 F.2d at 342).

<u>Circuit Court Authorities</u>

Two circuits have ruled on the priority status of claims for reimbursed unemployment benefits. In *Massachusetts Div. Of Emp't and Training v. Boston Reg'l Med. Ctr. (In re Boston Reg'l Med. Ctr., Inc.)*, 291 F.3d 111 (1st Cir. 2002), the Commonwealth of Massachusetts filed a claim asserting priority status for payments made by the Unemployment Compensation Fund to employees of the debtor. The Chapter 11 debtor objected to the priority status under 11 U.S.C. § 507(a)(8). The facts of *Boston Regional* are similar to those in this case. Citing *Suburban II,* the *Boston Regional* Court stated:

> A "financial exaction[ ]" is a tax when, among other things, its "burden and benefit inure to the general public welfare, and ... it [does] not provide a discrete benefit to, or result from privileges claimed by, the payor." *Suburban II*, 36 F.3d at 488-89. Moreover, those nonprofit employers permitted by federal and state law to make the choice of payments in lieu are precisely those employers whom the Internal Revenue Code exempts from federal income tax. *See* 26 U.S.C. § 3309 (citing § 3306(c)(8),

8

which in turn cites § 501(c)(3)). Thus, the idea that payment in lieu is not a tax, but instead a different kind of obligation that a nonprofit employer is permitted to assume in place of a tax, fits into the structure of the two congressionally enacted statutes relevant to this case.

What tips the scales in this case is the option that the Employment and Training Law and § 3309 give the Division to require a nonprofit employer to provide a surety bond. One of the important reasons for giving a special priority in bankruptcy to taxes is that the state and federal governments do not generally choose their tax debtors. "A taxing authority is given preferred treatment because it is an involuntary creditor of the debtor. It cannot choose its debtors, nor can it take security in advance of the time that taxes become due." H.R.Rep. No. 95-595, at 190 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6150; *see In re Taylor*, 81 F.3d 20, 23-24 (3d Cir. 1996) (relying on this language in holding that the three-year period during which tax claims receive priority was tolled by the pending of a debtor's earlier bankruptcy proceeding); *cf. United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 734-36, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) (discussing the government's status as an involuntary creditor and the resulting federal interest in a unique rule governing federal tax liens). A government may have potent enforcement measures, such as liens, at its disposal once it becomes aware of tax delinquencies. Nevertheless, these provisions operate after the fact, not before.

*Boston Regional*, 291 F.3d at 122-23.

After making the observation that the surety bond option is an important factor, the *Boston Regional* Court then stated the importance of this factor:

The government's inability to choose its debtors or take security is not the only reason for giving priority to taxes. Other reasons include the paramount importance of the government's interest in tax collection, the desire for fairness to different taxpayers by ensuring that each pays what he or she owes, and the interest of an individual debtor in paying debts that are not subject to discharge in bankruptcy before paying those that are. Yet the first reason is usually a strong reason, and the relative weakness of the Commonwealth's position on this issue, together with the other reasons to doubt that a payment in lieu should be treated as a tax, is decisive.

The Commonwealth can protect itself in advance against unpaid payments in lieu, as it cannot against unpaid income taxes. If it cannot choose its debtors, it can at least choose whether to be a secured or an unsecured creditor. It has explained that its decision not to do so was a matter of public policy. The obvious reason for the policy is that declining to require a surety bond lowers the costs imposed upon nonprofit employers doing business in the Commonwealth. That is an entirely reasonable policy. To achieve that goal, the Commonwealth has accepted a greater risk that some payments in lieu of contribution will not be made when nonprofit employers become insolvent, creating a deficiency that must somehow be made up.

*Boston Regional*, 291 F.3d at 123.

The *Boston Regional* Court held that the payments in lieu were not taxes with Section 507(a)(8). *Id.* at 124.

Likewise, in *Reconstituted Comm. of Unsecured Creditors v. New Jersey (In re United Healthcare System, Inc.)*, 396 F.3d 247 (3d Cir. 2005), the Third Circuit Court of Appeals agreed with the holding of *Boston Regional*, but for different reasons. In *United Healthcare*, the Third Circuit Court of Appeals shared the concerns of the Sixth Circuit Court of Appeals in *Suburban I* and *Suburban II*, but was concerned that a broader view was necessary to determine if the reimbursement obligation is a tax. In particular, the *United Healthcare* Court focused on whether the payment is used to support a general governmental undertaking:

> One major characteristic of the reimbursement obligation is that payments in lieu of contributions reimburse NJDOL for unemployment benefits actually paid and do not raise funds to support a general governmental undertaking. In contrast, quarterly contribution payments do support a general governmental undertaking. An employer paying the quarterly contribution tax is helping to create a fund from which NJDOL appropriately pays benefits. A contributory employer is obligated to contribute even if it does not actually use the government program, here unemployment compensation benefits paid to former employees. A payment in lieu employer, however, only reimburses NJDOL for payments NJDOL has made to its former employees.
>
> We disagree with the bankruptcy court that this distinction is immaterial; in fact, this distinction is crucial in unveiling the operation and actual effect of the reimbursement obligations. The bankruptcy court's focus on its observation that "[t]he payment burden of many tax statutes falls unevenly on taxpayers" is misplaced. 282 B.R. at 338. The issue is not whether some taxpayers pay more or less, but rather whether an entity is paying taxes or incurring some other type of obligation. Again, the relevant distinction is not whether some pay more or less, but whether some are paying to sustain a general governmental undertaking while others only are reimbursing the system for exactly the benefits paid to their former employees.
>
> Thus, rather than a tax, the reimbursement obligation is more like a promise in exchange for the privilege of employing individuals in the state without being required to pay state unemployment compensation contributions. The state will allow a non-profit employer to conduct business without making contributions to the state unemployment compensation fund, and the state will pay the unemployment

compensation benefits due to the non-profit employer's former employees, but this creates a debt, and the state insists on being repaid.

*United Healthcare*, 396 F.3d at 259-60.

The *United Healthcare* Court then concluded:

Contribution and reimbursement payments are distinct obligations with different sets of accompanying rules. They do not create one obligation that is applied to all New Jersey employers. Reimbursement payments are made in lieu of, or instead of, contributions. Reimbursement payments thus are something different than contributions, and the issue is whether those payments are excise taxes. Our functional examination reveals that reimbursement payments are not taxes, and therefore cannot be classified as excise taxes entitled to priority under section 507(a)(8)(E).

*United Healthcare*, 396 F.3d at 261.

Subsequent Cases Within the Sixth Circuit

After the *Boston Regional* and *United Healthcare* decisions, the Bankruptcy Court for the Western District of Michigan and the Sixth Circuit Bankruptcy Appellate Panel addressed the same issues before this Court in *In re Albion Health Services*, 339 B.R. 171 (Bankr. W.D. Mich. 2006), *aff'd* 360 B.R. 599 (B.A.P. 6th Cir. 2007).

In *Albion*, the debtor was a nonprofit organization that owned a hospital and had elected to be a reimbursing employer. It closed its doors in 2002 and its former employees made claims against the MUIA. The MUIA paid these claims and filed a claim seeking priority status under 11 U.S.C. § 507(a)(8)(E). The Chapter 7 trustee objected and the Bankruptcy Court sustained that objection.

After describing *Suburban I, Suburban II, Boston Regional,* and *United Healthcare,* the Bankruptcy Appellate Panel analyzed the issues as follows:

While reimbursement payments in lieu of contributions made by a nonprofit employer under MESA certainly have some tax characteristics, engaging in a functional examination of the obligation and its source reveals its non-tax character. As similarly found by the First and Third Circuits, reimbursement payments and

11

contributions under Michigan law are distinct obligations. *See* Mich. Comp. Laws Serv. § 421.13a(1) (providing that "[a]ny nonprofit organization ... shall pay contributions as a contributing employer pursuant to section 13, unless it elects to make reimbursement payments in lieu of contributions as a reimbursing employer pursuant to sections 13a to 13c."). Under Michigan law, a nonprofit employer's reimbursement obligation is limited to unemployment benefits actually paid. No part of the reimbursement payment is used to support a general governmental undertaking, such as, administering the state unemployment system. Unlike a contributing employer who must contribute regardless of whether it has former employees receiving benefits, a reimbursing employer pays only when benefits are paid to its former employees and only reimburses the state for the cost that particular employer caused the state to bear. The Third Circuit's conclusion that the effect of an employer electing to make reimbursement payments is "more like a promise in exchange for the privilege of employing individuals in the state without being required to pay state unemployment compensation contributions" is persuasive. *United Healthcare*, 396 F.3d at 260. Thus, reimbursement payments under MESA are better characterized as an alternative to paying taxes rather than as an alternative method of paying a tax, as contended by the Agency. *See id.* at 258.

Moreover, in *Suburban II*, the court found that because the employer's liability "arises solely by virtue of its default," it is not a liability "universally applicable to similarly situated persons or firms" and thus prevents the Bureau's claim from being accorded priority treatment. *Suburban II,* F.3d at 489. Here, the Agency's claim arises by virtue of Debtor's election not to pay the state unemployment compensation tax, but instead to reimburse the state for unemployment compensation payments attributable to service relating to employment with Debtor if and when such payments are made. It is not a liability universally applicable to all employers or even to all nonprofit employers. As in *Suburban II*, this lack of universality prevents the Agency's claim from being accorded priority treatment.

Although the Agency also argues that allowing its claim a tax priority will not disadvantage private creditors, under Michigan law, the execution of a bond or other security is required of certain nonprofit employers and the state is otherwise given discretion to require such security of nonprofit employers to ensure payment of a particular employer's reimbursement obligation. The Sixth Circuit found that affording priority status to the state's claim in a similar circumstance would indeed disadvantage private creditors in a manner that would be "unfair and without statutory justification." *Suburban II*, 36 F.3d at 489. In any event, the ability to require security for the obligation undertaken by a nonprofit employer electing to make reimbursement payments is an indication of the non-tax character of the obligation. *See id.; Boston Reg'l*, 291 F.3d at 122-23; *In re Sacred Heart Hosp. of Norristown*, 209 B.R. at 656 n. 8. Although it is true that no surety is involved in this case, the Agency agrees that it had the ability to require a surety bond. As in Boston Regional, by not doing so, the state accepted the risk that some reimbursement payments will not be made when nonprofit employers become insolvent. *See Boston Reg'l*, 291 F.3d at 123. The Panel's determination of whether

> Debtor's liability to the Agency is a tax cannot be based on the Agency's decision to require a bond or not. Instead the Panel must consider the operation of the statutory provisions under which Debtor's liability arises, provisions that clearly provide the Agency the ability to require a bond or other surety. *See CF & I Fabricators*, 518 U.S. at 220, 116 S.Ct. 2106.
>
> The Panel also rejects the Agency's argument that because of the close relationship between FUTA and MESA and because FUTA refers to the obligations of employers to contribute to the federal unemployment compensation system as "excise taxes," a nonprofit employer's reimbursement obligation is an "excise tax." Under FUTA, an excise tax is paid in wages with respect to "employment." 26 U.S.C. § 3301. FUTA excepts from the definition of "employment" service performed in the employ of a nonprofit employer. 26 U.S.C. § 3306(c)(8). Furthermore, the Supreme Court has instructed that courts must look behind labels placed on exactions in determining whether the exaction is a tax for priority purposes in bankruptcy. *CF & I Fabricators*, 518 U.S. at 220, 116 S.Ct. 2106; *see Howard Delivery Serv., Inc.,* 126 S.Ct. at 2113, 126 S.Ct. 2105 (refusing to borrow a definition from a statute designed without bankruptcy in mind and focusing instead on the "essential character" of workers' compensation regimes in determining priority status of the creditor's claim for unpaid premiums). As the Third Circuit explained, the role of FUTA in the Panel's inquiry "is limited to its mandate that states must provide non-profit employers with a reimbursement obligation option. That mandate still leaves open the question surrounding the nature of this obligation." *United Healthcare*, 396 F.3d at 260.

*Albion*, 360 B.R. at 610-11.

The *Albion* panel concluded that the claim for reimbursement was analogous to the claim for reimbursement of workers' compensation benefits as in *Suburban II*, and, therefore, denied the requested priority status under 11 U.S.C. § 507(a)(8)(E).

<u>Application of Case Law</u>

The instant case involving unemployment benefits is similar to *Suburban I* and *Suburban II*, which involved workers' compensation benefits, but the nature of the benefits are not identical. The Court does acknowledge that there is a difference between workers' compensation benefits and unemployment benefits, but does not see that difference as an important distinction. While unemployment benefits are essentially mandated by federal statute and states are given the authority to administer the unemployment compensation system, workers' compensation benefits lack both

13

federal or state mandate. However, under both *Suburban I* and *Suburban II,* the source of the benefit is not important, rather the factors set forth in *Suburban I* and *Suburban II* are determinative. Applying those factors to the instant case, the Court, much like the court in *Boston Regional*, notes the ability to request and require a surety bond or other form of security to be noteworthy. As stated by the *Suburban II* court, the existence of an actual set of creditors who may take less because of the existence of the MUIA claim causes this Court to conclude that the benefits in question here are not a tax as defined by Section 507(a)(8). While the Court acknowledges that there is no competing creditor class in this case, the applicable statutes clearly create the potential for such a class of creditors. While the MUIA argues that these creditors would seek their own source of repayment in the form of secured property, the unanswered question is still left as to what would happen if the property secured to such a surety or bond issuer was insufficient to reimburse the holder. This is especially true given that the nature of this obligation is a reimbursement of claims over a significant period of time by a substantial number of former employees. While the possibility of additional security could be a distinguishing feature for unemployment benefits, the possibility certainly exists that these creditors would not have sufficient collateral to cover their surety obligations and then would look to have a priority status, but would be unable to have that status given the definition of Section 507(a)(8). For those reasons, the Court concludes that the lessons of *Suburban I* and *Suburban II* instruct this Court that the unemployment benefits and claims of the MUIA in this case cannot be considered a tax under Section 507(a)(8).

Moreover, every Court of Appeals Panel that has addressed the issue of reimbursable unemployment benefits for a non-profit organization have held that the reimbursement portion of these claims are not entitled to Section 507(a)(8) status. Also noteworthy is that both *Boston Regional* and *United Healthcare* cite and rely upon *Suburban I* and *Suburban II* as an underpinning

14

for their decision and holding. The Sixth Circuit Court of Appeals and, therefore, this Court recognizes the importance of giving strong consideration to the decisions of other Circuit Courts of Appeals. *See, e.g., Terry v. Tyson Farms*, 604 F.3d 272, 278 (6th Cir. 2010) (citing *Wong v. PartyGaming Ltd.*, 589 F.3d 821, 827-28 (6th Cir. 2009), "[W]hile we recognize that we are not bound by the law of other Circuits, this court has also routinely looked to the majority position of other Circuits in resolving undecided issues of law. We also take note of the importance of maintaining harmony among the Circuits on issues of law." Neither *Boston Regional* or *United Healthcare* attempted to distinguish *Suburban I* or *Suburban II* and used each decision as a rationale for each panel's conclusion.

Taking it one step further, the Court notes that *United Healthcare*, citing many of the same concerns articulated by the Sixth Circuit Court of Appeals in *Suburban I,* continued its analysis for a broader view of whether the reimbursed unemployment benefits could be considered tax under Section 507(a)(8). This search appeared, in part, as an attempt by the *United Healthcare* panel to try to transform these reimbursed costs into a tax as defined by Section 507(a)(8). At best, as the *United Healthcare* panel noted, the issue became a closer issue, but not one that tipped the scales in favor of the finding that the reimbursed unemployment benefits were indeed a tax.

Finally, this Court has the benefit of the *Albion* cases which directly address the issue of reimbursed unemployment benefits in Michigan. While there may be nuanced differences between the unemployment benefits from Massachusetts or New Jersey, the states involved in *Boston Regional* and *United Healthcare* respectively, in *Albion* the unemployment benefits were clearly administered by the MUIA. In addressing *Albion*, the MUIA argues that *Albion* was wrongly decided and is not binding on this Court. While it is true that neither decision is binding on this Court, both *Albion* decisions clearly followed Sixth Circuit Court of Appeals precedent and analyzed

15

the facts using the proper Sixth Circuit Court of Appeals authorities. The MUIA did not argue that additional facts were presented to this Court that were not presented to the *Albion* courts; instead, the MUIA merely argues that a different result should ensue.

While this Court is not bound by the decisions of either *Albion* court, this Court need not assert its independence by taking a contrary course. This Court can find no fundamental flaw in the *Albion* decisions and declines the invitation of the MUIA to assert judicial independence by taking a contrary result. If this Court needs to assert such independence, it will reserve the right to do so in those cases where the Court concludes that the reasoning or rationale of other panels is faulty.

As part of its argument, the MUIA urges this Court to adopt the reasoning of *Fagan v. State of Mich., Dept. of Treas. (In re Fagan)*, 465 B.R. 472 (Bankr. E.D. Mich. 2012) and *Quiroz v. State of Mich., Dept. of Treas., (In re Quiroz)*, 450 B.R. 699 (Bankr. E.D. Mich. 2011). In *Fagan*, the court had a matter of first impression as to whether an international fuel tax assessed under the Michigan Motor Carrier Fuel Tax Act, M.C.L. § § 207.211 - .232, constituted an excise tax and, therefore, was entitled to priority under Section 507(a)(8)(E). In *Fagan*, the debtors filed a Chapter 7 petition on April 14, 2010. A debt of $80,190.19 for fuel tax was listed as a debt in their schedules, and they received a discharge on November 17, 2010. Their case was subsequently closed and then reopened to determine whether the debtors' obligation for the Michigan Motor Carrier Fuel Tax was excepted from discharge. In *Fagan*, the taxes involved were incurred by a corporation controlled by the debtors for the period of March 2008 - September 2009.

The *Fagan* Court had to analyze whether the tax in question was on a transaction that occurred before the date of the petition. Utilizing the *Suburban I* and *Suburban II* analysis, the Court concluded that these taxes were indeed an excise tax on a transaction and, therefore, excepted from discharge.

In *Quiroz*, the debtors owed the State of Michigan money for the Michigan Single Business Tax. One of the debtors in *Quiroz* owned a company that ceased business operations in 2006. The State of Michigan, Department of Treasury, determined that the company failed to pay the Michigan Single Business Tax for 2005 and 2006. The debtors filed their petition seeking relief under Chapter 7 of the Bankruptcy Code on January 8, 2008, and then sought a determination that Mr. Quiroz's obligation was discharged. The *Quiroz* Court analyzed the issue primarily under state law, but also applied necessary federal authorities under Section 507(a)(8). The *Quiroz* Court concluded that the Michigan Single Business Tax is a tax on a transaction and, therefore, not dischargeable in Chapter 7 proceedings.

In this case, the MUIA argues that the reimbursement assessment is a tax on a transaction. At oral argument, the MUIA stated that the transaction was the payment of the unemployment benefit to the affected employee. While this Court concludes that both *Fagan* and *Quiroz* were correctly decided under the facts presented to each court, the applicability of each decision is suspect at best to the instant case.

First, the transactions in both *Fagan* and *Quiroz* clearly occurred years prior to the bankruptcy petition in each case. Here, with the exception of Claim 133, the reimbursed amounts occurred after the Debtor filed its petition. As Section 507(a)(8) states, the excise tax in question must be incurred before, not after, the petition. Second, with unemployment benefits, namely the payment of unemployment benefits by a not-for-profit organization, the transaction is reimbursement, not a tax. Unlike the situations in both *Fagan* and *Quiroz* where the debtors or the debtors' related entities had some sort of control over the transaction, here the opposite is true. The Debtor in this case needed to make the hard financial decision that certain employees had to be terminated. The amount involved here is not an amount that is designed to pay for the general

17

operating costs of government; rather, it is a charge to repay the government for expenses already incurred.

Finally, the Court must acknowledge the need for a uniform rule regarding unemployment benefits, at least in Michigan. The current state of law is that, by virtue of *Albion*, reimbursed unemployment benefits in the Western District of Michigan are not considered to be a tax under Section 507(a)(8) and, therefore, not entitled to priority. The MUIA urges this Court to hold that these reimbursed benefits are a tax and, therefore, entitled to Section 507(a)(8) status. While the need for uniformity is not in and of itself a reason to overrule the objection to the proofs of claim of the MUIA, it is a factor that cannot be ignored. If this Court were to adopt the position urged by the MUIA, then there would be significant differences in how reimbursed unemployment benefits are treated within the State of Michigan. On the western side of the state, these benefits would not be given any priority and debtors would be able to more easily reorganize. On the eastern side of the state, the same benefits would be given priority and reorganization would be more difficult. The impact on the debtors would be significant and the impact on other parties would be as significant, if not more so. In a Chapter 11 setting, other creditors who stand to receive distributions in a reorganization would receive significantly less on the eastern side of the state. On the western side of the state, however, those creditors would receive significantly more. From a practical standpoint, the lack of uniformity could be devastating.

On its own, the need for uniformity does not mean that this Court would follow decisions from courts with only persuasive authority if this Court believed that persuasive authority was wrong. In this case, however, the Court can find no serious flaw in the decisions of the courts which have addressed the very issue before the Court in this case. Moreover, this Court concludes that the Sixth Circuit Court of Appeals' decisions of *Suburban I* and *Suburban II*, as extended to the facts in this case, lead the Court to conclude that the amounts claimed by the MUIA are not afforded

status as set forth in Section 507(a)(8).

## Conclusion

For these reasons, the Court sustains the objections of the Debtor to Claims 133 and 134, as amended, of the MUIA. Counsel for the Debtor is instructed to prepare an Order consistent with this Opinion and submit that order consistent with the rules governing presentment of orders of this Court.

**Signed on May 21, 2013**

                                                                   **/s/ Daniel S. Opperman**
                                                              **Daniel S. Opperman**
                                                               **United States Bankruptcy Judge**